# Baltimore & Ohio R. R., Appellant, *v.* Public Service Commission.

*Railroads—Full crew—Brakeman—Duties in lunch car—Act of June 19, 1911, Sec. 5, P. L. 1053.*

A complaint filed with the Public Service Commission, charging that a railroad company operated a train consisting of an engine and eight cars with a crew of only five men in violation of the Act of June 19, 1911, Sec. 5, P. L. 1053, should be dismissed where it appears that six men were employed on the train, including two brakemen, that one of the latter attended to the comfort of passengers in a lunch car, collecting what was due from them, but that he was at all times under the orders of the conductor, and was fully competent as a brakeman.


Argued Oct. 19, 1916. Appeal, No. 262, Oct. T., 1916, by plaintiff from order of Public Service Commission of the Commonwealth of Pennsylvania, on petition of order of Railway Conductors and Brotherhood of Railway Trainmen. Before ORLADY, P. J., PORTER, HENDERSON, HEAD, KEPHART, TREXLER and WILLIAMS, JJ. Reversed.


Petition for order to compel respondent to operate a train with one man more than had been employed in operating it.

The facts are stated in the opinion of the Superior Court.


*Error assigned* was order in accordance with the prayer of the petition.


*William B. Linn,* with him *H. B. Gill, William L. Kinter, John T. Brady* and *William A. Barkalow,* for appellant.


No printed brief for appellee.

OPINION BY HEAD, J., March 9, 1917:

The complaint filed with The Public Service Commission charged that the appellant railroad company operated a certain passenger train consisting of an engine and eight cars with a crew of five men, in violation of the provision of Section 5 of the Act of Assembly approved June 19, 1911. The answer of the company was fully responsive. It denied the material fact averred in the complaint and declared that said train was operated with a crew of six men, to wit, one engineman, one fireman, one conductor, one baggageman and two brakemen or flagmen. In a word, the train was equipped with the complement of men required by the statute. At the hearing enough testimony was adduced to make plain the existing facts. As to these there is no controversy. The real contention turns on the construction of the statute as applicable to the established facts.

It appeared the train in question was in the class created by Section 5 of the statute. There was left no doubt the conductor, responsible for the safety of the train and its passengers had, subject to his order and under his control, the full complement of men prescribed by the act. As to five of the men composing the crew, no question is raised. The varying contentions of the parties arise from their different viewpoints as to the status of the sixth man, named Thurman. The evidence disclosed he had several years' experience as a brakeman on other lines of railroad before he entered the service of the appellant company. He had successfully passed the examination required—not by the statute, for it prescribes none—by the company to ascertain his competency to perform the duties of a brakeman as those duties were defined by its own rules.

One of the cars carrying passengers was a combination smoking and lunch car. During a certain portion of the train's run a meal was served in this car to those passengers desiring such accommodation. Thurman was assigned to the duty of looking after the comfort of the

passengers of the lunch car, collecting what was due
from them, making change, etc.; but he was at all times
subject to the orders of the conductor, competent and
obligated by the terms of his employment to do any serv-
·ice required by his chief necessary to promote the safe
operation of the train.    Did this state of facts disclosed
by the evidence sustain the material averment of the
complaint, to wit, that the train in question had been
manned by only five of the six employees prescribed by
the statute?

The act is entitled "An act to promote the safety of
travelers and employees upon railroads by compelling
common carriers by railroad to properly man their
trains." In its several sections, from the first to the
sixth inclusive, it classified trains according to the num-
ber and character of the cars composing them and pre-
scribed that each train, as it is classified, must be manned
by the number of persons designated by the terms "con-
ductor, engineman, brakeman, flagman," adopted in the
act.    Manifestly it was not the intent of the act to re-
lieve an operating company from any part of the respon-
sibility for the safe. operation of its trains theretofore
and yet imposed by law.    Hence the legislature properly
refrained from defining either the qualifications or the
duties of the several persons to be in charge of such a
train, save in so far as such qualifications and duties
may be inferred from the names used to designate the
several individuals.    In Penna. R. R. Co. v. Ewing, 241
Pa. 581, it was held the act was a proper exercise of the
police power of the State and involved no violation of
any constitutional limitation of the legislative power.
Gathering the legislative intent from the language in
which it is clothed, it appears to be reasonably plain the
law making power was content with the declaration that
the safety of passengers and employees, upon a train of
the size and character in question, would be promoted if
the responsible head of the crew, the conductor, had at
his command and under his control the services of five

other qualified operatives rather than four.   It appears from the evidence, and the commission has so found, that the man Thurman was in every way qualified to perform any and all of the duties which the conductor could properly require of a brakeman.   As we have said, the legislature did not attempt to define these qualifications or duties, much less did it undertake to declare that when the normal operation of the train provided no demand for the performance of any specific duty as a brakeman or flagman, the company was forbidden assigning to such employees any duties at all.

It is in evidence the combination car was occupied by travelers.   It was for the comfort and convenience of a portion at least of the travelers that meals were provided in that car.   The brakeman Thurman, while temporarily discharging the duties of a dining car conductor, had these passengers immediately under his eye and every opportunity to see that this particular car was properly ventilated, lighted, heated and running under normal conditions.   We think it beside the mark to argue that while performing those duties, specially incident to the dining car, as distinguished from any other car, he was not in a position to discharge the duties of a brakeman. The answer to this is in the uncontradicted evidence that it was at all times within the power of the conductor of the train to utilize the services of this employee in any portion of the train should the necessity arise therefor. To hold therefore that it was a violation of the act for the company to direct or permit this man to collect the meal fares in the dining car and look after the comfort particularly of those passengers there assembled, would be a construction of it not fairly warranted either by its language or by the declaration of the intention of the statute as the same appears in its title.   The evidence was wholly barren of any intimation that the manner in which this train was operated would tend to decrease the safety of either passengers or employees.   It thus appears to us there was no violation either of the letter or

spirit of the statute.   The train was manned by the number of employees named in the act.   Each one of them was fully competent to perform the services indicated by the descriptive terms of the statute and all were under the immediate order, direction and control of the conductor, who, for the time being, was the authorized representative of the operating company, responsible for the safe operation of the train.

We cannot close our eyes to the significance of the fact, within the common observation of the traveling thousands, that modern trains are equipped with "air brakes," under the control of the engineer.   It is he, not the brakeman, who controls the speed of the train.   What then are the duties of a "brakeman," since he no longer is one "who brakes"?   The rules of any particular company, are not made a part of the statutory law of Pennsylvania.   In so far as the rules of the appellant company were read into the record of this case, they rather indicated the duties of a brakeman were those of an assistant to the conductor, that he was a member of a class in which future conductors were trained and from which they were graduated.

This appeal was argued on one set of paper books with the appeal of the Philadelphia & Reading Ry. Co., No. 263, October Term, 1916, and the Appeal of Central R. R. Co. of New Jersey, No. 264, October Term, 1916. In each of the two appeals last named, the facts were identical with those in the case at bar and the orders appealed from resulted from the construction placed upon the statute by The Public Service Commission.   In those appeals therefore judgments will simply be entered without any further opinion.

The order of The Public Service Commission is reversed and set aside and the record is remitted to that body with direction to enter an order dismissing the complaint, the appellee for costs.